Filed 3/1/22  P. v. James CA1/2
Opinion following transfer from Supreme Court
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CHLOE ALEXANDRA JAMES,<br><br>    Defendant and Appellant. | A157062<br><br>(Solano County<br>Super. Ct. No. FCR322082) |

A jury found defendant Chloe Alexandra James guilty of felony child abuse or endangering the health of a child (Pen. Code,[1] § 273a, subd. (a)) and found true the special allegation that she personally inflicted great bodily injury on the victim, D.G., who was under five years old (§ 12022.7, subd. (d)). The court then found James had a prior conviction of a serious felony. (§§ 667, subds. (b)-(i), 1170.12.)  She was sentenced to 18 years in prison.

On appeal, James contends (1) defense counsel provided ineffective assistance when he failed to move to exclude her statements to detectives, (2) the trial court erred in refusing to allow defense counsel to ask hypothetical questions of the defense expert witness on police interrogation techniques, (3) the trial court erred in failing to instruct the jury, sua sponte, that it could consider the reliability of her admission in determining her

---

[1] Further undesignated statutory references are to the Penal Code.

1

guilt, and (4) the trial court erred in denying her *Romero*[2] motion to strike or dismiss her prior conviction for sentencing purposes. James also asks this court to review the trial court's pretrial ruling on her *Pitchess*[3] motion.

The Attorney General concedes the matter should be remanded for the trial court to exercise its discretion on the *Romero* motion, and we agree with the parties on this issue. We remand to the trial court to reconsider the *Romero* motion and to apply the newly-amended sentencing law.[4] We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Defendant begins babysitting D.*

The G. family—mother K., father K., and baby D.—lived across the street from defendant in Fairfield. Mrs. G. and defendant became close after D. was born in December 2015. Defendant had a little boy, and she offered baby clothes to Mrs. G.

When Mrs. G. decided to return to work after maternity leave, she was unable to find daycare. Defendant was a stay-at-home mother, and she offered to watch D. until the G.'s could arrange daycare. Mrs. G. felt comfortable with defendant taking care of D. because she had seen how

---

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

[3] *Pitchess v. Superior Court* (1974) 11Cal.3d 531 (*Pitchess*).

[4] After we filed our initial opinion in this appeal on October 28, 2021, our Supreme Court granted defendant's petition for review and transferred the matter to us to vacate our decision and reconsider the matter in light of Senate Bill No. 567 (Stats. 2021, ch. 731), newly enacted legislation which amends Penal Code section 1170 by making the middle term the presumptive sentence unless certain circumstances exist. Defendant had not previously challenged on appeal the imposition of the upper terms.

defendant interacted with her own son and stepson[5] and how she interacted with D.

Defendant started babysitting D. fulltime at the end of April 2016.

*D.'s Injury*

On June 13, 2016, D. was just shy of six months old. He was not crawling, but he could roll over from his stomach to his back. The G.'s dropped D. off with defendant in the morning as usual. Around 10:30 or 11:00 a.m., defendant texted Mrs. G. that D. was a little fussy. He was teething; defendant gave him a teething ring and reported he was fine. Around 2:00 p.m., defendant texted that D. was fine and that he was a sweet boy and liked to cuddle.

Mrs. G. picked up D. shortly before 5:00 p.m. and did not notice anything unusual. Mr. G. came home between 5:30 and 6:00 p.m. Mr. G. happened to touch the left side of D.'s head while holding him, and the baby let out an alarming scream. Mr. G. had never heard a child scream like that before. The G.'s then noticed swelling on the left side of D.'s head.

Mr. G. called defendant and asked if anything happened, and she said no. About five minutes later, defendant called Mrs. G. and told her that she remembered she had propped D. up in a boppy (a nursing pillow) on the play carpet in the living room before going to the kitchen for a bottle and when she returned from the kitchen, D. had flopped backwards out of the boppy and was on his back screaming.

---

[5] Defendant had a young son, whom she described as in his "terrible two's" in June 2016. Defendant also lived with her fiancé and his older son.

The G.'s took D. to the emergency room in Vacaville.  A CT scan showed a skull fracture, and D. was transferred by ambulance to the pediatric unit of the Kaiser hospital in Oakland.

Dr. Shaun Fitzgerald, a pediatric hospitalist, examined D.  Fitzgerald recommended an ophthalmology exam and skeletal survey to look for other injuries because the family's explanation of what happened "did not completely match the injuries that [the doctor] was observing."  He was told that D. was on the floor and fell from a boppy, but Fitzgerald did not believe simply falling from a seated position, even onto a hardwood floor, would cause a skull fracture.  Fitzgerald testified that swelling would begin within hours after suffering an injury such as D.'s, but he could not determine with certainty when D. had been injured.  He agreed that D.'s injury was potentially consistent with having fallen from a couch two to three feet off the ground onto a hard surface such as a hardwood floor or brick.

Dr. Stephanie Yamout took over D.'s care after Dr. Fitzgerald's shift ended on the morning of June 14.  She thought it would take anywhere from "minutes to hours" to notice the swelling after D. received his injuries.  In her experience, a baby falling from sitting would not cause such a severe fracture as D. had.  Yamout agreed it was possible D.'s injuries could have been caused by falling off a couch two or three feet high onto a hardwood floor or a brick fireplace.  She could not tell when the injury occurred.

D. stayed in the hospital for three days.  X-rays showed he had three skull fractures—two on the parietal bone on the side of the head and another fracture on the occipital bone at the back of the head.  There was also a possible fracture of the right third rib.

About three weeks after he was discharged from the hospital, D. began projectile vomiting and screaming.  A few days later, his eyes started to

4

bulge.  The G.'s took D. to the emergency room, and he was again transferred to the Oakland hospital.  D. had surgery to place an extraventricular drain to decrease pressure in his head.  D. stayed in the hospital for 10 days.  By the time of trial in December 2018, D. was "great" according to Mrs. G.

*Detectives Meet with Defendant and Question Her at the Police Station*

Solano Child Protective Services received a report regarding D., and the matter was referred to Fairfield police detective Michael Arimboanga and his partner Adam Brunie.  On June 14, Arimboanga spoke with D.'s parents, Dr. Yamout, and a social worker at the hospital.  Based on what he heard, Arimboanga determined that he needed to speak with defendant since it appeared she was caring for D. when he was injured.

Arimboanga and his partner went to defendant's house that evening.  Arimboanga told defendant he was investigating D.'s injury and he wanted to get her side of the story.  Defendant showed him where she had placed D. in the boppy in her home; the boppy (described as a U-shaped pillow) was on a small rug in a living area near a brick fireplace and a couch.  Arimboanga asked defendant to come to his office for an interview, where the interview room had a better recording system, and she agreed to do so.

In the police department interview room, Arimboanga read defendant her *Miranda* rights, and then he and his partner Detective Brunie questioned her.  Arimboanga testified that he distinguishes between interviews and interrogations, explaining that in an interview, he asks questions and gives the person an opportunity to tell her side of the story, whereas an interrogation is "the confrontation stage," during which he confronts the person by stating he does not believe what he is being told or saying something along the lines of, "Hey, that's not what the evidence is showing . . . ."

5

Arimboanga testified the questioning of defendant began as an interview and became an interrogation.  Defendant was in the interview room for about two and a half hours, but the detectives took long breaks.  Defendant was alone in the interview room for a total of about an hour during those breaks.  A videorecording of defendant's interview/interrogation was played for the jury.

*Defendant's Recorded Statements to the Detectives*

At the beginning of questioning, defendant maintained she placed D. and the boppy on the floor, and she heard D. start to cry while she was in the kitchen.[6]  She "didn't see anything, but just heard him crying."  Defendant told Arimboanga, "there's a lotta . . . crawling around" and D. "loves to bounce back"; she had said to Mr. G., " 'The only thing that I can think of, is that he probably bounced back and [hit] his head on the brick.' "  She ran back to D. immediately and did not notice anything unusual (no bumps or bruises), D. "was just crying."  Asked why she did not mention the incident to Mrs. G., defendant responded that she "wasn't really concerned about it because [she] didn't see anything" and she "didn't think it was anything of severity."

The detectives had defendant demonstrate how D. was placed on the floor using the boppy and a doll (Arimboanga referred to the doll as a simulated toddler).

Detective Brunie told defendant that D. had multiple fractures and it was difficult to square defendant's story with the severity of his injuries.  He wondered aloud whether defendant was "maybe leaving out a little bit more as to what happened" because she had "that guilt of, 'I was supposed to be watching him.' "  Defendant responded, "Yeah, I know."  Brunie said, "I

---

[6] The summary is based on both the transcript and the video itself.

think—pretty much your story, your account is one hundred percent accurate, except I think you're leaving something out regarding maybe where he was. I don't necessarily think he was on the floor at the time—for whatever the reason. That's not a big deal. But I think you realized maybe where he was and you don't wanna really say, 'Hey maybe he wasn't really on the floor just because I don't want you to think I'm a bad babysitter or I wasn't paying attention to him.'" He told defendant, "Accidents happen like that. An accident is not a crime," and defendant said, "Right."

Brunie continued, "But we need to understand fully how that accident happened so that it doesn't look malicious and it doesn't look like a crime. Does that make sense?" "It's one thing to tell the parents, 'Hey this is what happened and I hope they believe me because that's about as much of the explanation as I wanna give 'em.' It's a different thing to simply tell a few detectives that were assigned this morning deal with this. The truth compared to what you told the parents. And it's not to say that you're a bad person because of that." The detective asked, "[A]m I dancing around the right path?" Defendant responded, "You're right."

Defendant then admitted D. fell from the couch, not while he was placed on the floor. She reported D. was crying and screaming and she "didn't know what to do." She said, "I had him on the [b]oppy and I put the [b]oppy down on the couch, put him in it, ran to get a bottle, and he fell on the floor on the back of his head. And I picked him up and it was a little swollen and I put ice on it, and I didn't know what to do. Because it's like, you know." She thought this happened the previous Friday (not Monday, which was the day before the interview). Defendant said D. "projectile vomited" all over her shirt. She showed Mrs. G. her shirt when Mrs. G. picked up D. on Friday, and Mrs. G. said it was acid reflux.

7

Detective Arimboanga told defendant she had her "days mixed up" because if D. had been injured Friday, the parents would have known something within three or four hours, and D. "would not have made it through the weekend." Defendant stated she was "very distraught all day dealing with" Mr. G. and, "it could have happened Monday."[7] Arimboanga said, "[I]f you think it happened Friday, . . . you're wrong, it [did] not happen on Friday." Defendant responded, "You're right. It happened on Monday. He fe[l]l off the couch. I was super upset about it. I didn't know what to do. So I put him down—after I picked him up and put him on the [b]oppy, had him sittin' up, went and got his bottle and came back."

Arimboanga asked defendant to show him again how she put D. down on the boppy. She demonstrated and said he was "not completely secure in the [b]oppy." Defendant said she ran to get the bottle and heard a "thud." She ran back and D. "wasn't crying," he was "[n]ot choking, but like struggling to breathe." She fed him his bottle, and he threw up all over her. She thought this happened around 4:00 p.m. after D. woke up from his afternoon nap. Defendant emphasized that she was "really scared" and it was a "complete accident."

Arimboanga told defendant he needed to take a break to talk to his boss. He asked whether defendant wanted water or something. Defendant declined but asked if she could see her son. (It is evident from the video of the interview that defendant's son and fiancé were at the police station close

---

[7] Defendant explained she had been dealing with the G.'s all that day (June 14). Mr. G. first told her that D. had a skull fracture, then right before the detectives arrived at defendant's house, he said it was three fractures. She said Mr. G. was concerned "people think that he's abusin' his child and we're both in the same—it's just." Defendant did not finish her thought and stated she couldn't believe this happened.

by the interview room.)  Arimboanga said, "[G]ive us a few seconds 'cause we're almost done here."  The detectives then left defendant alone in the interview room for more than 30 minutes.

After the break, defendant left to use the bathroom and returned. Brunie asked defendant about "the level of stress in [her] life."  Defendant talked about the stress of being a stay-at-home mother with no social interaction; she mentioned her own son having tantrums and acting out and frustration in her relationship with her fiancé.  She said she took medicine for depression and, "I don't feel depressed lately but, um, I'm not happy in my life."

Brunie suggested defendant was frustrated on Monday because D. was crying and because of other circumstances in her life.  He offered his theory that, given her frustration and the medical information that D. may have fractured a rib, it was "a little bit more plausible" defendant "threw [D.] a little bit and that's how he tumbled."  As Brunie demonstrated with the doll and the boppy how he thought she threw the boppy and D. together onto the couch, defendant said, "I wouldn't say it was like that," referring to the detective's demonstration.  Brunie continued describing and reenacting his theory of what happened.  "[Y]ou get up and you give him, probably enough force to get him goin', right?  . . . and it's kind of a one motion, you get it off your belly, you get him too and it's just like a . . . ."

Defendant then admitted she tossed D. onto the couch and saw him bounce off and hit his head on the brick fireplace.  She said, "Do you want me to show you like sitting here?  And I got up and like you showed and I'm not throwing him, but just tossed him right here and he bounced and his butt bounced off that and hit [the] brick and then he landed right here.  [¶] . . . [¶] And I just said, 'Oh shit.' "  Defendant described D. as falling backwards,

9

and she thought he would land on the pillows but "he bounced off his butt and hit his head . . . on the brick right about when I was—after I was walking away and then hearing the thud, ran back and propped him on the boppy pillow right there and went to finish to get his bottle." She told the detectives that D. was trying to gasp for air and then he cried and cried. When she picked him up, he threw up all over her. Defendant panicked and admitted she downplayed the incident when describing it to Mrs. G. because she was "really scared that something could really . . . be wrong."

Defendant again admitted she "tossed" D., stating that she did not tell her fiancé "that I had tossed him because I didn't want him to pass judgment on me and be like, 'Um, what [were] you thinking?' " She said her frustration was with life in general and D. "wasn't [her] target of frustration at all."

*Defense*

The defense called one witness, Professor Richard Leo, as an expert in "social psychology, criminology, and the specific study and practice of police interrogation and psychological coercion." Leo explained that in the past, police interrogations could be physically violent, but "today, it's all psychological." He testified that police officers in the United States typically are trained in specific psychological interrogation techniques and methods, which are designed to "break down the denials and move the suspect to admission."[8]

Leo testified the goal of interrogation is to influence suspects to confess. There are two steps to reach this goal. First, "convince the suspect that they

---

[8] Like Arimboanga, Leo distinguished between interviews, which he said are "more like a conversation," and interrogation, which "is much more goal directed, much more accusatory, and involves these techniques" he was testifying about.

10

are caught" and "all the evidence establishes their guilt, there is no way out of the situation." Second, convince the suspect "it's in their self-interest" to confess, that "the best choice they have is to stop denying and start admitting to the crime they are being accused of in the interrogation."

Leo described interrogation as "a very repetitive activity" and identified the following "basic techniques": isolate the suspect; develop rapport over time; give *Miranda* warnings if the suspect is in custody and then "accuse them of committing the crime, accuse them of lying when they den[y] committing the crime," and challenge the suspect's denials as implausible or inconsistent with the evidence; use "personal pressure" to raise "anxiety or make the suspect think it is the only opportunity they will have to . . . minimize the damage of the situation"; appeal to the suspect's self-interest in moral, religious, psychological, or legal terms, for example, by focusing on how "what they say will influence other people in a favorable or not favorable way"; and "come up with two scenarios, both of which involve the suspect committing the act," giving a good choice (it was an accident or self-defense) and a bad choice (it was premeditated).

He elaborated that suspects are made to think conviction is inevitable and "they need to give an account or agree to the account the interrogator suggested that minimizes their damage, even if they were not involved in a crime or the facts are different than what they are being accused of."

Leo testified that, unless a suspect confesses right away, interrogators necessarily use psychological pressure and manipulation. He said there are two risks to the use of psychologically coercive interrogation techniques. "One is that you elicit an involuntary confession against the suspect's will. And the other is that you elicit an unreliable confession, which could be partially unreliable or false." "It could be that somebody had some

11

involvement in a crime, but their confession overstates their involvement; or they did the physical act, but they confessed to a false mental state. So you can have a partially true and partially false confession, and that would be unreliable in varying degrees."

There are situational and individual factors that increase the risk of eliciting a false confession. Situational risk factors include the use of false evidence, the "use of minimization that communicates or implies . . . leniency in exchange for confession," long interrogations that go six hours or more, and sleep deprivation. Individual risk factors include being a juvenile or having a "highly suggestible personalit[y]" and "being an obedient personality."

Leo testified that there was no dispute that false confessions occur. In cross-examination, he testified that the conventional wisdom was most confessions are true or partially true and false confessions are rare, "but we don't know how rare. [One] percent, 5 percent, 10 percent, we don't know."

In his closing argument, defense counsel argued defendant left D. on the couch, the baby fell off the couch and hit his head, and what occurred was "a terrible accident," not a crime. He told the jury Detective Arimboanga had good intentions, but in wanting "to hold accountable somebody for the injuries to a little child," the detective "turned what was an accident into something it wasn't."

Defense counsel asserted, "You heard the testimony of Dr. Leo. After hearing that testimony and after hearing about how police interrogations work, and after hearing the testimony of this detective here, I submit to you that there's obviously reasonable doubt here, very obvious." He pointed out the techniques the detectives used that Leo had described and argued, "My client didn't enthusiastically adopt their theory. [¶] At a certain point, she had enough and she slumped her head down and said, 'Yeah.' The next thing

12

she did was yawn. She wanted out of there. After being told by this detective so many times that obviously he believed it was an accident, she thought this was her way out. Because an accident is not a crime, right. But turns out he was lying. He tricked her."

## DISCUSSION

A.    *Defense Counsel's Failure to Move to Exclude Statements*

Defendant contends defense counsel provided ineffective assistance because he did not file a pretrial motion to exclude her statements to the detectives on the ground they were involuntary.

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; accord, *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [habeas corpus is the more appropriate procedure to address an ineffective assistance of counsel claim because it may include evidence of an attorney's reasons for making the complained-of decision, which is outside the appellate record].)

Here, the record is silent as to why defense counsel failed to challenge the admissibility of defendant's statements based on involuntariness. To assess whether there could be a satisfactory explanation for defense counsel's omission, we consider the law on involuntary confessions.

"An involuntary confession may not be introduced into evidence at trial." (*People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*).) "The test for the voluntariness of a custodial statement is whether the statement is

13

' "the product of an essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion." (*People v. Cunningham* (2015) 61 Cal.4th 609, 642 (*Cunningham*).) The question of voluntariness is determined under the totality of the circumstances. (*Ibid.*) Relevant considerations include " ' "the crucial element of police coercion," ' " the length and location of the interrogation, and the defendant's traits, including her age, education, and physical and mental health. (*Id.* at pp. 642–643; see also *In re Elias V.* (2015) 237 Cal.App.4th 568, 577–587 [discussing psychological interrogation techniques and recognizing the danger of false confessions].)

"Coercive police conduct includes physical violence, threats, direct or implied promises, or any other exertion of improper influence by officers to extract a statement." (*People v. Battle* (2021) 11 Cal.5th 749, 790.) Our Supreme Court has explained that " 'the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession.' " (*People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*).) But " '[o]nce a suspect has been properly advised of his rights, he may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect.' " (*Ibid.*; accord *People v. Spencer* (2018) 5 Cal.5th 642, 674 [quoting *Holloway*]; *Carrington, supra,* 47 Cal.4th at p. 170 [same].)

" 'In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary

14

and unreliable." ' " (*Cunningham*, *supra*, 61 Cal.4th at p. 643.) The mere fact that the police lie to a suspect during questioning does not render the suspect's statements involuntary. (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280.) "Police officers are . . . at liberty to utilize deceptive stratagems to trick a guilty person into confessing. The cases from California and federal courts validating such tactics are legion." (*Ibid.*, citing cases.)

Defendant asserts on appeal that the detectives used coercive tactics that overcame her will. She cites the following conduct as evidence of coercion. The questioning began with the detectives stating defendant was not under arrest. She was then read her *Miranda* rights in "a low-key manner . . . consistent with the [detectives] never informing [her] that she potentially faced criminal charges stemming from the incident." At one point, defendant asked to see her son, and the detectives did not allow it. She was left alone when the detectives took long breaks. Detective Brunie told defendant he generally believed her account except for the part about D. being on the floor. He said it was "not a big deal" and, "Accidents happen like that. An accident is not a crime." The detectives repeatedly told defendant they believed the injury was an accident. Brunie "became aggressive" when defendant said the accident occurred Friday rather than Monday. Brunie asked about how frustrated, depressed, and stressed out she was at the time.

Defendant claims there was ample basis upon which defense counsel could have argued her statements should be excluded as involuntary. But defense counsel reasonably could have determined otherwise. First, the questioning in this case was not inherently coercive. The detectives did not threaten harm or falsely promise benefits. Rather, they confronted defendant with facts that appeared to contradict her version of events and suggested a theory of events. These tactics are permissible. (*Holloway*, *supra*, 33 Cal.4th

15

at p. 115.)  In particular, "suggestions that the [incident] might have been an accident . . . were not coercive; they merely suggested possible explanations of the events and offered defendant an opportunity to provide the details of the crime.  This tactic is permissible." (*Carrington*, *supra*, 47 Cal.4th at p. 171.) Second, the interrogation was not unusually lengthy, and the setting was not physically harsh.  (See *People v. DePriest* (2007) 42 Cal.4th 1, 35 [rejecting a claim of involuntariness where the defendant "was not worn down by a lengthy interrogation or deprived of human comforts or necessities"].)

The test for voluntariness includes consideration of the defendant's traits, but defendant was a 26-year-old adult.  (Cf. *In re Elias V.*, *supra*, 237 Cal.App.4th at p. 578 [juveniles are more suggestible than adults].)  Defense expert Leo testified suggestible and obedient personalities were risk factors for eliciting a false statement, but no evidence was offered that defendant had such personality traits.  Nor was evidence presented that she was of low intelligence or low educational attainment.  (Cf. *Procunier v. Atchley* (1971) 400 U.S. 446, 453–454 ["Low intelligence" of the suspect relevant "in establishing a setting in which actual coercion might have been exerted to overcome the will of the suspect"]; *People v. Cahill* (1994) 22 Cal.App.4th 296, 317 [relying on the facts the defendant was an 18-year-old "whose education extended only to the eighth grade" in determining law enforcement questioning amounted to an improper promise].)  Defendant claims it was "clear" that the detectives were aware she suffered from bipolar disorder and depression and that they "were likely capitalizing on that when they repeatedly suggested that she was frustrated and stressed."  But defendant

16

did not provide a citation to the appellate record on this point, and we see no mention of bipolar disorder in the interview/interrogation.[9]

In *People v. Lucas* (1995) 12 Cal.4th 415 (*Lucas*), habeas corpus granted in part on other grounds in *In re Lucas* (2004) 33 Cal.4th 682, the defendant argued he received ineffective assistance of counsel in the guilt phase when his trial counsel failed to challenge the admission of his statements based on alleged involuntariness. (*Id.* at p. 441.) Our Supreme Court rejected this argument citing, among other things, that the defendant did not claim at trial that the allegedly coercive tactics overrode his will to resist. (*Id.* at p. 442.)

Similarly, in this case, defendant points to nothing in the record showing that defendant herself claimed that her will was overborne by the detectives' tactics. Indeed, the record does not foreclose the possibility that defense counsel discussed the issue with defendant and she did not believe her will was overborne. "[A]n attorney naturally must assess his or her client's account of the interrogation in order to determine the plausibility of a claim that statements were involuntarily obtained. Counsel here may have concluded their client's account would not support such a claim in this instance." (*Lucas*, *supra*, 12 Cal.4th at p. 442.) On this record, we cannot say there could be no satisfactory explanation for defense counsel's omission. It is possible defense counsel chose not to file a motion to exclude defendant's statements on the ground of involuntariness because counsel reasonably believed such a motion had "little or no basis." (*Ibid.*; see *People v. Price*

---

[9] Elsewhere in defendant's opening brief, she refers to her diagnosis of bipolar disorder with a record cite, but it is to a pretrial services report, which in turn references what defendant said about her mental health issues in a "probation interview," not in the interrogation by the detectives.

(1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile"].)

Defendant, however, argues the defense theory at trial was predicated on the contention that her statements "were involuntary because her will was overborne by the coercive interrogation techniques employed by [the detectives]," so defense counsel could have no reason not to raise the same contention in a pretrial motion to exclude the statements.[10] But defense counsel did not argue to the jury that defendant's will was overborne during the interrogation such that her statements were involuntary; rather, he argued her statements communicating agreement with the detectives' theory that she tossed D. were unreliable. This is a different argument. Even when a defendant's statement is admissible because it was voluntarily made, " 'evidence surrounding the making of [the statement] bears on its

---

[10] Defendant notes that during a pretrial discussion of a discovery motion regarding Dr. Leo's testimony, the trial court asked defense counsel whether he was moving to exclude defendant's statements as involuntary, given that defense briefing on the defense expert witness indicated Leo could testify on "the phenomenon of false confessions" to show the detectives' interrogation techniques "created a risk of false and *involuntary* confession." (Italics added.) Defense counsel responded that he was not. The trial court asked, "So at this point, you've actually simply offered [Leo's testimony] . . . on the issue of . . . [the] second prong, the reliability portion; correct?" Defense counsel responded, "Correct, your Honor." Recall that psychological interrogation tactics are only prohibited when " ' "they tend to produce a statement that is both [(1)] involuntary and [(2)] unreliable" ' " under the circumstances. (*Cunningham*, *supra*, 61 Cal.4th at p. 643.) As discussed above, defense counsel may have had a satisfactory reason for believing he could not establish defendant's statements to the detectives were involuntary (and, therefore, a motion to exclude would have been futile). Yet, at the same time, defense counsel could reasonably have believed a defense based on the unreliability of defendant's statements was viable under the circumstances.

18

credibility.'" (*Crane v. Kentucky* (1986) 476 U.S. 683, 688 (*Crane*).) In *Crane*, the United States Supreme Court observed, "[*E*]*ntirely independent of any question of voluntariness*, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility." (*Id.* at p. 689, italics added.) Thus, there is nothing contradictory or inherently unreasonable in defense counsel determining that a pretrial motion to exclude based on involuntariness would be futile and then presenting evidence and arguing to the jury that defendant's statements were, nonetheless, " 'unworthy of belief.' " (*Id.* at p. 689.)

B.    *Court Ruling Regarding Questioning Expert Leo*

Next, defendant contends the trial court committed prejudicial error "when it refused to allow defense counsel to examine his expert witness through the use of hypothetical questions, thereby violating [defendant's] rights to due process of law, to present a complete defense and to a fair trial."

1.    Procedural Background

Well before trial, defense counsel sent the prosecutor an email with the subject line "Witness Statement Disclosure," describing defense counsel's interaction with defense expert witness Dr. Leo. Defense counsel wrote that he "had a very brief conversation" with the expert, during which Leo informed him, "based on his review of the material . . . (including the recorded interrogation and police reports), he believed that the police used interrogation methods and/or techniques known to cause false confessions and therefore he could provide material testimony at the trial in this case." Defense counsel provided the expert's CV but told the prosecutor that Leo had not prepared a report and that counsel would not be requesting one

19

because it was not essential to preparing for trial and would result in unnecessary expense.

The People filed a discovery motion requesting a court order that defense counsel "immediately turn over any handwritten notes (or other statements) from Dr. Leo," and if there was no discoverable information, the People sought exclusion of Leo's testimony "for lack of relevancy."

The defense filed an opposition arguing Leo's testimony was necessary to explain the phenomenon of false confessions and to counter commonly held misconceptions that would otherwise lead jurors to underestimate the possibility that a suspect would confess to a crime she did not commit. Defense counsel argued evidence bearing on the reliability of defendant's statements to the detectives was relevant and admissible, citing *Crane*, *supra*, 476 U.S. 683 and *People v. Page* (1991) 2 Cal.App.4th 161 (*Page*). The opposition stated Leo would testify on (1) "general psychology factors and interrogation techniques which might lead to an unreliable confession" and (2) "specific evidence in [defendant] James' taped statement which indicates that those psychological factors and interrogation techniques were present in this case," but he would not testify that defendant's statements were false.

The trial court heard argument on the matter after the trial started. The prosecutor accused defense counsel of gamesmanship in failing to produce any documentation on what Leo would testify to and requested the court exclude the witness. Defense counsel responded that the prosecution knew everything about Leo that he knew and said, "I don't have anymore information that I haven't given to them." He denied any gamesmanship, explaining it was "simply an economic reality and there's no requirement . . . [of] a report."

The court stated its ruling. It considered two categories of proposed testimony from the defense expert: (1) general testimony "to educate the jury about . . . myths" regarding false confessions, and (2) testimony "about what [Leo] saw on the video and his conclusions based on that." The court ruled the first category of testimony would be allowed but the second category would not.

As to the first category, testimony on police interrogation techniques in general, the court found the proffered evidence "perfectly acceptable," citing *Page*, *supra*, 2 Cal.App.4th 161.

As to the second category, testimony on the specifics of defendant's interrogation, the court reasoned: "[Defense] counsel's indicated he doesn't know what [Leo is] going to say in that regard. There's no report . . . so it's speculation as to what he's going to say. I don't know if he's going to say anything relevant. I don't know if he's going to say anything that's probative, and when I weigh that against undue consumption of time, this unknown testimony has very little probative value, as far as I'm concerned. [¶] Maybe it would be great testimony; maybe it wouldn't be; but when I'm doing a 352 balancing analysis, an unknown testimony to my mind has little probative value and may just be a waste of time. So under those facts, I'm not going to allow him to come in and say he saw [defendant's] video; point out at this specific point, this officer used this technique, etc."[11]

_____

[11] Although the parties did not mention Evidence Code section 352 in their motion papers, they undoubtedly understood "352 balancing" to refer to the court's discretion under section 352 to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

21

The court elaborated on its evidentiary ruling: "[Dr. Leo is] not to mention that he's reviewed the videos; that he's seen the videos. He's to—his testimony in this regard is well-known, so I don't want him to shade his testimony towards what he knows in the video. He's to play it straight and inform the jury as to these factors, and then it will be up to both counsel to make the argument—'cause some factors might apply; some factors might not apply. You can each make your pitch to the jury as to that regard."

Defense counsel asked the court, "So I just want to clarify what the Court's ordering. What I'm understanding is the Court is not going to allow the expert to testify about his analysis of the facts in this case; correct?" The court confirmed this was correct.

Then defense counsel asked, "I just want to make sure that I'm going to be able to ask hypotheticals that may mirror the facts."

The court responded, "No; because—and the reason why is because I know he's seen the videos. So . . . I'm familiar with some of this testimony—you know. They'll talk about, you know, how long you leave somebody in there. So, you know, don't ask him a hypothetical of this and this fact, but ask him—you would be certainly well to say, well, what's the range where you see this effect come into play? I don't want you to put the direct facts of this case in front of him, because he knows those direct facts. [¶] So I think you can get what you want; you just have to be careful the way you get there."

The court further instructed, "You can ask him about [the factors you look for in a false confession] in general, but what I don't want you to do is say to him, okay, we got a confession, an alleged confession that took two-and-a-half hours. There were two officers here. They did bad cop/good cop. What's the combination of those three factors? What does that look like to

22

you?  You're going to have to make that argument yourself.  So you could have him identify all the factors, explain how they might relate to each other, but he's not going to give the conclusion.  You're going to argue that."

2.    Analysis

Defendant claims the trial court erred in ruling defense counsel could not pose hypothetical questions to expert witness Leo.

As a preliminary matter, the Attorney General argues defendant has forfeited this appellate challenge to the trial court's evidentiary ruling because, after the court stated defense counsel could not ask hypothetical questions of Leo, defense counsel neither objected nor made an offer of proof regarding the hypothetical questions he wanted to ask.

To preserve an appellate challenge to the exclusion of proffered evidence, the proponent must "ma[k]e known to the court" "[t]he substance, purpose, and relevance of the excluded evidence."  (Evid. Code, § 354, subd. (a); *People v. Ramos* (1997) 15 Cal.4th 1133, 1178.)  In *People v. Fauber* (1992) 2 Cal.4th 792, for example, the appellant argued for the first time on appeal that the trial court erred in excluding certain evidence as hearsay because the evidence was relevant for a nonhearsay purpose.  (*Id.* at p. 854.)  Our high court concluded the appellant was "precluded from complaining on appeal" because defense counsel did not "specifically raise this ground of admissibility" at trial.  (*Ibid.*)

In this case, the trial court ruled that hypothetical questions would not be allowed after it had ruled Leo would not be allowed to identify specific techniques used in defendant's interrogation because defense counsel could not make an offer of proof (as counsel did not "know what [Leo was] going to say in that regard") to establish relevance.

Defendant now contends for the first time on appeal that the trial court erred in prohibiting hypothetical questions that mirrored the facts of her interrogation because the California Supreme held in *People v. Vang* (2011) 52 Cal.4th 1038, that an expert properly may "express an opinion, based on hypothetical questions that track[ ] the evidence." (*Id.* at p. 1048.)

Defense counsel, however, did not "specifically raise this ground of admissibility" before the trial court. (*People v. Fauber*, *supra*, 2 Cal.4th at p. 854.) Nor is this contention necessarily responsive to the court's reasoning that questions related to the particular facts of defendant's interrogation would not be allowed because defense counsel failed to establish relevance. The Attorney General argues, "It is therefore not surprising that while in this Court [defendant] argues that the trial court abused its discretion in not permitting defense counsel to 'use hypothetical questions' with Dr. Leo 'to elicit testimony regarding the circumstances of this particular case' . . ., [defendant] never sets forth any such hypothetical questions or specifies the circumstances of this case that the court should have permitted Dr. Leo to testify about." On this record, we agree with the Attorney General that defendant's claim is forfeited.

In any event, defendant's claim also fails on the merits.

Expert witnesses are limited to opinion testimony "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) " 'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.' " (*People v. Duong* (2020) 10 Cal.5th 36, 60.)

Here, the trial court's initial ruling that Leo could not identify the specific techniques used by the detectives in defendant's interrogation (the second category of proposed testimony) comports with *Page*, *supra*, 2 Cal.App.4th 161, a case that defendant herself relied on in her brief in the trial court opposing the People's motion to exclude Leo.

In *Page*, the defendant intended to call an "expert on persuasion and conformity" and proposed three general categories of testimony: (1) "the general psychological factors which might lead to an unreliable confession"; (2) identification of particular elements in the taped police interrogation "which indicated that those psychological factors were present" in the defendant's interrogation; and (3) the expert's opinion on the reliability of the defendant's confession. (*Page*, *supra*, 2 Cal.App.4th at pp. 180, 183.) The trial court restricted the expert testimony to the first category only. (*Id.* at p. 183.)

The Court of Appeal held the trial court acted within its discretion in excluding the second category of testimony because such testimony would not be necessary once the first category of testimony was fully presented. The court reasoned that after an expert educates the jurors on the expert's subject matter, " 'the factual issues in the case become ones that the jurors can answer as easily as the expert.' In other words, an expert's thorough description of the general principles to be applied in a given case may make additional (and more specific) expert testimony superfluous. [Citations.] In such a case, ' "[t]here is no necessity for [additional expert] evidence, and to receive it would tend to suggest that the judge and jury may shift responsibility for decision to the witness[ ]." ' " (*Page*, *supra*, 2 Cal.App.4th at p. 189.)

25

The *Page* court continued, "[I]n the present case, [the expert] outlined the factors which might influence a person to give a false statement or confession during an interrogation. Having been educated concerning those factors, the jurors were as qualified as the professor to determine if those factors played a role in Page's confession, and whether, given those factors, his confession was false. [¶] In sum, we conclude the trial court did not abuse its discretion when it limited [the defense expert]'s testimony" to the first category of proposed testimony. (*Page*, *supra*, 2 Cal.App.4th at pp. 188–189.)

In this case, defense expert Leo testified at length about interrogation techniques and the potential for unreliable admissions—his testimony spans over 60 pages of reporter's transcript, in a trial that involved only three days' of witness testimony.[12] Following the reasoning of *Page*, the trial court did not abuse its discretion in excluding hypothetical questions that mirrored the facts of defendant's interrogation because such questions were not necessary once Leo thoroughly educated the jury on psychological interrogation techniques.

Defendant's reliance on *People v. Vang*, *supra*, 52 Cal.4th 1038, on appeal is unavailing. There, our high court held only that it was permissible for a gang expert to "express an opinion, based on hypothetical questions that tracked the evidence, whether the assault, if the jury found it in fact occurred, would have been for a gang purpose." (*Id.* at p. 1048.) In doing so, the court disagreed with the appellate court, which held it was error to allow such hypothetical questions. (*Id.* at p. 1041.) Of course, the *Vang* court did not hold that trial courts are *required* to allow hypothetical questions of

---

[12] Leo's testimony took up a good share of that time. Leo was the first witness called on the second day of trial, and his testimony continued after the lunch break.

26

experts in all cases. Nor did the court purport to limit the trial court's broad discretion regarding the admissibility of expert opinion generally. In short, nothing in *Vang* undermines *Page* or our analysis.

Finally, we reject defendant's constitutional claims that the exclusion of hypothetical questions denied her the rights to present a complete defense and to a fair trial." Here, as in *Page*, the defense was allowed "to thoroughly explore the physical and psychological environment in which the confession was obtained" and the defense expert was allowed "to testify as to the psychological factors which could lead to a false confession"; under these circumstances, the trial court's limitation on the expert's testimony did not amount to a violation of the constitutional right to present a complete defense. (*Page, supra,* 2 Cal.App.4th at pp. 185–186.)

C.    *Jury Instructions*

Defendant argues she was entitled to an instruction advising the jury that it could consider the reliability of her statements in determining guilt, and the trial court erred in failing to so instruct the jury sua sponte or, alternatively, defense counsel was ineffective in failing to request a pinpoint instruction. We find no prejudicial error.

1.    The Trial Court's Sua Sponte Duty to Instruct

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.)

The court's duty to instruct, however, does not extend to " 'specific points or special theories which might be applicable to a particular case, absent a request for such an instruction.' " (*People v. Ramsey* (2000) 79 Cal.App.4th 621, 630.) If " 'an instruction relates "particular facts to the

27

elements of the offense charged," it is a pinpoint instruction and the court does not have a sua sponte duty to instruct.'" (*People v. Garvin* (2003) 110 Cal.App.4th 484, 489; accord *People v. Anderson* (2011) 51 Cal.4th 989, 996–997 [when a defendant attempts to negate or rebut the prosecution's proof of an element of the offense, the trial court has no sua sponte duty to give a pinpoint instruction relating the defendant's evidence to the elements of the offense].)

On appeal, defendant claims the trial court should have instructed the jury that it "was required to determine if [her] statements [to the detectives] were reliable and credible in light of the manner by which they were obtained." This proposed instruction relates particular evidence presented at trial (the videotaped interrogation, Dr. Leo's testimony) to the elements of the offense. Thus, it is pinpoint instruction, and the trial court had no sua sponte duty to give it. (*People v. Garvin, supra*, 110 Cal.App.4th at p. 489; *People v. Anderson, supra*, 51 Cal.4th at pp. 996–997.)

2.    Ineffective Assistance of Counsel

In the alternative, defendant argues defense counsel was ineffective in failing to request a pinpoint instruction.

It is well established that to prevail on a claim for ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness, and (2) prejudice, that is, a reasonable probability that the result of the proceeding would have been different absent the alleged error. (*Strickland v. Washington* (1984) 466 U.S. 668, 693; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.)

Here, even if we assume it was unreasonable for defense counsel not to request a pinpoint instruction along the lines proposed on appeal, defendant has failed to show prejudice.

The jury in this case was given CALCRIM No. 358 on evidence of defendant's statements: "You have heard evidence that the defendant made an oral or written statement before the trial. You must decide whether the defendant made any such statement, in whole or in part. If you decide that the defendant made such a statement, consider the statement, *along with all the other evidence*, in reaching your verdict. *It is up to you to decide how much importance to give to the statement*."[13] (Italics added.)

As we have described, Leo testified at great length about interrogation techniques and the potential for unreliable admissions. In their closing arguments, both the prosecutor and defense counsel focused the jury on the reliability of defendant's statements to the detectives and the circumstances of the questioning.[14] Defense counsel suggested defendant was nervous and

[13] The trial court also instructed the jury with CALCRIM No. 357 on adoptive admissions as follows: "If you conclude that someone made a statement outside of court that accused the defendant of the crime or tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true: [¶] 1. The statement was made to the defendant or made in her presence; [¶] 2. The defendant heard and understood the statement; [¶] 3. The defendant would, under all the circumstances, naturally have denied the statement if she thought it was not true; [¶] AND [¶] 4. The defendant could have denied it but did not.

"If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose."

[14] The prosecutor told the jurors they had the opportunity to watch the entire interview and urged them to look at defendant's demeanor. She said, "When someone tells a lie, they have different versions of the lie. When you tell the truth, there's only one truth. [¶] In this case, when the defendant was interviewed by the officers, she came in, she was giggling, she was joking about her weight. So clearly she was comfortable in her environment."

scared in the interview room.  He urged the jury to watch the video again and argued it would show that defendant "disaffirm[ed]" the detectives' suggestion she threw D. and that she "said no, it didn't happen like that.  She didn't toss the child.  That's what she was saying."  Referring to Leo's testimony on how police interrogation works, defense counsel argued that defendant "didn't enthusiastically adopt [the detectives'] theory" and that the detectives "tricked" her.

The jury was instructed, "It is up to you to decide how much importance to give to the [defendant's] statement."  Given the jury instructions, evidence, and closing arguments in this case, we agree with the Attorney General that the jury undoubtedly understood that it had to decide whether defendant's inculpatory statements to the detectives were reliable. Defendant has not persuaded us that a pinpoint instruction telling the jury it was required to determine whether defendant's statements "were reliable and credible in light of the manner by which they were obtained" would have made any difference in the outcome.  Under these circumstances, defendant's claim of ineffective assistance of counsel fails because she has not established prejudice.

D.  *Romero Motion*

1.  Procedural Background

Defendant was convicted of felony child abuse (§ 273a, subd. (a)) with an enhancement for great bodily injury to a child under the age of five (§ 12022.7, subd. (d)).  She was also found to have a prior serious felony

---

Later, she pointed out the video shows that defendant "grabs the doll herself and she demonstrates what she did with [D.] . . . and this is not something the police say, *she tells you herself that she got up, she tossed [D.] and his butt hit the edge of the couch*."  (Italics added.)

conviction; in October 2012, she was convicted in Napa County Superior Court of first-degree burglary (§ 459).

The trial court sentenced defendant to 18 years in prison—the upper term of six years, doubled due to the prior strike conviction, plus an upper term of six years for the enhancement under section 12022.7, subdivision (d).

On appeal, defendant challenges the trial court's denial of her *Romero* motion to strike the prior conviction.

According to the probation report, defendant's prior conviction for burglary "involved [defendant] entering her friend's house to steal an iPad from her friend and a debit card belonging to an acquaintance. She admitted to using stolen property to receive Oxycontin." Defendant stated she took OxyContin for a year before "she got clean" in August 2012, and she has maintained her sobriety since then. Defendant had another prior felony conviction, for possession of stolen property (§ 496), also from October 2012. These crimes were committed when defendant was 22 years old.

Defendant filed a "*Romero/Williams* request."[15] She asked the court to consider that she "was a young mother that was baby sitting for her neighbor and had been experiencing recent stress" at the time of her current offense and that her prior strike offense "was merely a property crime for the purpose of fueling a drug addiction." She urged it would serve "the interests of justice that this young woman who is on her way to prison be given the opportunity to reenter society at a young enough age in life where she can reestablish herself in our society and start over after having been adequately punished for [her] crime."

---

[15] *People v. Williams* (1998) 17 Cal.4th 148 (*Williams*).

The People opposed the motion. They noted the current offense was defendant's third felony conviction. The People asserted defendant "showed no remorse and blamed her actions on others" in her prior offenses. They concluded, "Looking at the whole picture, defendant clearly f[ell] under the spirit and purpose of the three strikes law."

At the hearing on the motion, defense counsel argued that defendant's prior burglary conviction was not violent and asked the court to strike the prior conviction "in light of the conduct that gave rise to that prior conviction."

After stating it "considered the comments of counsel, the submission of counsel," the trial court denied defendant's *Romero* motion. The court explained its reasoning: "The legislature was clear, in terms of which felonies they find qualify for the purposes of the three strikes law, and burglary is one of them, rightfully so. If someone invades someone else's house, in order to commit a felony, it can . . . have lasting consequences to the victims. It can also be incredibly dangerous, so the *Romero* motion is denied."

2. Analysis

In ruling on a *Romero* motion, the trial court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [spirit of the three strikes law] scheme[] . . . in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams, supra,* 17 Cal.4th at p. 161.) Defendant refers to these considerations as "the *Williams* factors."

We review a court's decision not to strike or dismiss a prior conviction allegation for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367,

32

374 (*Carmony*).) "Where the record is silent [citation], or '[w]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance.' " (*Id.* at p. 378.)

Defendant contends the trial court erred in failing to consider the *Williams* factors because "its sole consideration [in deciding the motion] was whether a first degree burglary is appropriately deemed a strike." The Attorney General changed its position and conceded at oral argument that remand was appropriate in this case in light of the recently decided opinion in *People v. Avila* (2020) 57 Cal.App.5th 1134.

We agree with the parties. Here, the record is not silent as to the trial court's reasoning in denying defendant's motion, and the court's pronouncement does not demonstrate the " 'court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law.' " (*Carmony*, *supra*, 33 Cal.4th at p. 378.) To the contrary, it appears the court denied the *Romero* motion either because the crime of residential burglary can be "incredibly dangerous" in the abstract or because it surmised, without evidence, that the burglary defendant committed was dangerous. In either case, it does not appear the court appropriately considered the facts and circumstances of defendant's current and prior offenses and her particular background, character, and prospects. The record here suggests defendant's prior crimes were related to a drug addiction to OxyContin, her criminal history does not include any actual violence, and she cooperated with the police in this case, circumstances that may indicate she is outside the spirit of the three strikes law. (*People v. Garcia* (1999) 20 Cal.4th 490, 503; *People v. Avila supra*, 57 Cal.App.5th at pp.1140–1141 ["Cumulative circumstances,

33

including that a defendant's crimes were related to drug addiction and the defendant's criminal history did not include actual violence, may show that the defendant is outside the spirit of the Three Strikes law"].) And defendant's prospects appear to be good. She reports she has addressed her drug addiction, she is a high school graduate and trained pastry chef, and she has maintained positive relationships with her family[16] and her boyfriend (previously her fiancé). On this record, we will remand to allow the trial court to analyze defendant's *Romero* motion in conformity with the spirit of the law.

E.     *Pitchess Motion*

Defendant filed a pretrial *Pitchess* motion seeking relevant information from the personnel files of Detective Arimboanga and Detective Brunie. The City of Fairfield Police Department provided records including personnel folders for both detectives, and the trial court stated for the record what documents it examined in camera. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1228 [in deciding a *Pitchess* motion, a trial court makes an appropriate record when it "state[s] for the record what documents it examined (such transcript, of course, to be sealed)"].) At defendant's request, we have reviewed the sealed transcript of the in camera proceeding. The trial court properly swore in the custodian of records, and we find no abuse of discretion in the court's determination that there was no relevant information to disclose. (See *ibid.* [review of a trial court's decision on a *Pitchess* motion is for abuse of discretion].)

---

[16] Defendant submitted several letters from family members, including one from her grandmother attesting to the attentive care defendant provided her during her extended convalescence after surgery in 2017.

34

F.    *Senate Bill No. 567*

Senate Bill No. 567 (2021-2022 Reg. Sess.) (S.B. 567) amended Penal Code section 1170, effective January 1, 2022, so that it now provides, "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (Pen. Code, § 1170, subd. (b)(2).)

As we have seen, defendant was sentenced to upper terms for the underlying offense and the enhancement. And as we have noted, after we filed our initial opinion on October 28, 2021, the California Supreme Court granted defendant's petition for review and transferred the matter to us to reconsider the matter in light of S.B. 567. The parties agree that S.B. 567 applies retroactively to this case and that the matter should be remanded for resentencing under current Penal Code section 1170. We agree with the parties and remand the matter to the trial court for resentencing. (See *People v. Flores* (2022) 73 Cal.App.5th 1032 [2022 WL 121934, at **7] [remanding for resentencing under Penal Code section 1170 as amended by S.B. 567].)

## DISPOSITION

The sentence is vacated and the matter is remanded to the trial court to reconsider defendant's *Romero* motion under applicable legal principles and to sentence defendant under Penal Code section 1170 as amended by S.B. 567. The judgment is otherwise affirmed.

35

_____

Miller, J.


WE CONCUR:


_____

Richman, Acting P.J.


_____

Mayfield, J.*


A157062, *People v. James*

---

&ast; Judge of the Mendocino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.